**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Frederick PRATTER, Defendant-
Appellant.**

**No. 71–1425.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 2, 1972.

Decided July 25, 1972.

Rehearing Denied Sept. 6, 1972.

**228**

James Manahan, DeWitt, Richards & Manahan, Indianapolis, Ind., for defendant-appellant.

Stanley B. Miller, U. S. Atty., and Richard Louis Darst, Asst. U. S. Atty., Indianapolis, Ind., for plaintiff-appellee.

Before KNOCH, Senior Circuit Judge, and STEVENS and SPRECHER, Circuit Judges.

STEVENS, Circuit Judge.

While studying at the University of Indiana in the spring of 1969, appellant and his wife resided in a house at Rural Route 6 on Whitehall Pike near Bloomington. They were both tried for violating 21 U.S.C. § 176a[1] by receiving and concealing marihuana knowing that it had been imported contrary to law. Mrs. Pratter was acquitted. The appeal from Pratter's conviction raises several questions, principally whether appellant had "refused"—within the meaning of 18 U.S.C. § 3109—to admit the arresting officers to his home before they admitted themselves. The answer depends on a consideration of the facts immediately preceding their entry.

I.

On April 29, 1969, an inspector for the Bureau of Customs in Indianapolis examined a suspicious-looking package and found it to contain a broken plaster of paris statue in which about a pound of a dark substance had been packed. Chemical analysis revealed, and a second analysis confirmed, that the substance was hashish, the hallucinogenic resin of the marihuana plant. The package had been shipped from Bombay, India, addressed to plaintiff at his residence near Bloomington. The agents sprayed the contents of the package with a fluorescent dust, repacked it, and then cleared it for delivery by a private carrier. Arrangements were made to transfer the package to the carrier's driver on the outskirts of Bloomington; he was then followed by three agents in two

[1]. Section 176a is now superseded by provisions of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 84 Stat. 1236 (effective May 1, 1971).

cars; they observed the actual delivery to Mrs. Pratter in front of the Pratter home at about 12:30 P.M. on May 1. One agent then left to telephone for a search warrant.

About 45 minutes later appellant arrived home. Except for a brief exit to pick up some textbooks from his car, there was no activity around the house until agent Hulswit arrived with the warrant at about 2:45 P.M. With one agent at the back of the house, three others, with guns drawn and accompanied by an Indiana state trooper, proceeded to execute the warrant. Agent Hulswit testified that a large dog by the front door ran away as they approached. He continued:

> "Then when we got to the door I knocked on the door quite loudly, and announced that I was a federal agent with a search warrant. And then I thought we would have to kick the door down—

"Q. Why did you think that?

"A. Based on other cases of a similar nature that I have worked on.

"Q. What happened instead?

"A. Well, I turned the door handle, like I was—so there would be less lock to go against if it was kicked, and the door came open, so the three of us walked in." (Tr. C455–456.)

On cross-examination Hulswit testified:

"Q. You turned it, and it opened right then?

"A. Well, I had to push it.

"Q. Right then?

"A. Yes.

"Q. A second or two after you said, 'I am a federal agent; I have a search warrant'?

"A. That's right.

"Q. You did that immediately after knocking?

"A. Immediately after or during the time I was knocking.

"Q. And so from the—That was the sequence, then, from the knock to your entry, which immediately followed the door opening; would that be correct?

"A. Well, there was some time between the events. Maybe it was a couple seconds between each event. It wasn't a long time." [2]

When the agents entered, appellant was returning to the livingroom from the rear of the house and Mrs. Pratter was in the hall, having just left the bedroom. The home was promptly searched. An examination of the bathroom with an ultraviolet lamp did not indicate the possibility that the hashish might have been flushed down the toilet. It was found in clear plastic sandwich bags stuffed between large sacks of garbage in the back of the house. A hashish pipe and debris from the unwrapped package and broken statute were found in the livingroom.

A motion to suppress the hashish and pipe was denied by the district court without findings of fact or an opinion.[3] After a trial before a jury, appellant was convicted and his wife was acquitted.[4]

---

2. Tr. C474–475. Agent Markonni testified:
"Q. How long was it, in your recollection and judgment, between the time you knocked on the door and the door was opened?
"A. Several seconds; I would say probably ten seconds, ten to fifteen seconds. *I hadn't actually planned to enter the residence that soon,* but the door was open, the door was unlocked." Tr. C510, (Emphasis added.)

3. *Cf.* United States v. Sicilia, 457 F.2d 787 (7th Cir. 1972).

4. Both testified at the trial. According to their testimony, Mrs. Pratter was taking a nap when appellant opened the package and placed the hashish in sandwich bags. He testified he panicked when he observed police coming up the driveway and, with no intent to defraud the United States, hastily tried to conceal the hashish in the garbage area. He also offered evidence to prove that the package was intended for a friend for whom he was receiving mail.

## II.

■ Section 3109 authorizes a federal officer to "break open" the door of a house if necessary to execute a search warrant.[5] An unauthorized entry effected by the use of no more force than necessary to turn the knob and open an unlocked door is a "breaking" within the meaning of § 3109. Sabbath v. United States, 391 U.S. 585, 589–590, 88 S.Ct. 1755, 20 L.Ed.2d 828; *cf.* Munoz v. United States, 325 F.2d 23, 26 (9th Cir. 1963).

■ The Supreme Court has not yet decided what "exigent circumstances," if any, may excuse compliance with the statute. See Sabbath v. United States, 391 U.S. at 591, 88 S.Ct. 1755. It is settled, however, that if such circumstances are not present, evidence seized from a dwelling entered in violation of the statute is inadmissible. Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190. The question presented by this appeal is whether the agents' entry into appellant's home was justified; if not,

the hashish and pipe were improperly received in evidence.

■ Under the language of the statute the issue is whether "after notice of [their] authority and purpose, [the agents were] refused admittance." Without specific reference to the statutory language, the government argues that exigent circumstances justified a prompt entry. Before considering the circumstances which the government emphasizes, we note that although the issue is one of statutory construction, rather than constitutional law, the Anglo-American tradition of respect for the privacy of the home and the dignity of the citizen even when suspected of criminal behavior forecloses a "grudging application" of the statute. *Id.* at 313, 78 S.Ct. at 1197.[6]

· The statute applies to a critical situation which is fraught with danger for the entering officers as well as the occupants of the dwelling. Prompt action and surprise may be necessary to forestall escape, the destruction of evidence, or even

---

5. 18 U.S.C. § 3109 provides:
 "The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant."
 This section is a 1948 revision, 62 Stat. 820, of a statute enacted in 1917, which provided, in part:
 "The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute the warrant, if, after notice of his authority and purpose, he is refused admittance." 40 Stat. 229.
 The common law origin of the statute is reviewed in Miller v. United States, 357 U.S. 301, 306–309, 78 S.Ct. 1190, 2 L.Ed. 2d 1332.
 Subsequent to the search in this case, Congress provided a more liberal provision, with concomitant safeguards, for execution of warrants in drug cases in the Comprehensive Drug Abuse Prevention and Control Act of 1970, 84 Stat. 1236, § 509(b) at p. 1274 (effective May 1, 1971). Under prescribed conditions, a magistrate may provide in the warrant for execution without an announcement of authority and purpose.

6. "We are duly mindful of the reliance that society must place for achieving law and order upon the enforcing agencies of the criminal law. But insistence on observance by law officers of traditional fair procedural requirements is, from the long point of view, best calculated to contribute to that end. However, much in a particular case insistence upon such rules may appear as a technicality that inures to the benefit of a guilty person, the history of the criminal law proves that tolerance of shortcut methods in law enforcement impairs its enduring effectiveness. The requirement of prior notice of authority and purpose before forcing entry into a home is deeply rooted in our heritage and should not be given grudging application. Congress, codifying a tradition embedded in Anglo-American law, has declared in § 3109 the reverence of the law for the individual's right of privacy in his house. Every householder, the good and the bad, the guilty and the innocent, is entitled to the protection designed to secure the common interest against unlawful invasion of the house."

violence; yet prompt action and surprise may also precipitate such consequences. In short, the execution of a warrant is a job for a professional,[7] trained both to perform his mission and to heed the statutory command to show a decent respect for the privacy of the citizen before bursting into his home.

In this case, the government's brief relies on no precise justification but instead recites a variety of circumstances to portray an aura of exigency. There was a large watchdog in front of the house as the agents approached; they "thought he was going to attack one of the agents as we went up to the door."[8] But the dog meandered off before the agents reached the front door.[9] Presumably there was some possibility of resistance, but surveillance suggested no special risks within the apparently peaceful home of a student couple, and the presence of five armed officers was adequate protection against foreseeable risks of violence.

Of greater significance was the risk that the evidence might be flushed down a toilet before it could be seized. Again, however, the agents had taken the precaution of spraying the evidence with fluorescent dust and had already analyzed the hashish before permitting its delivery in order that the crime could be committed. The likelihood that criminal behavior would remain undetected or unprovable was insufficient to obviate the obligation to respect the statutory command. Indeed, the agents themselves did not believe it was necessary to make such a prompt entry and had not concluded that they had been refused admittance.

 Even though special circumstances may constitute a constructive "refusal" to admit officers who have announced their purpose, or may otherwise excuse compliance with § 3109, such circumstances are not evidenced here.[10]

---

7. This point was given dramatic emphasis by the Report of the January 1970 Grand Jury, United States District Court, Northern District of Illinois, Eastern Division:

"At 4:45 a. m., December 4, 1969, fourteen Chicago police officers assigned to the Cook County State's Attorney's Office, executed a search warrant for illegal weapons at 2337 West Monroe in a flat rented by members of the Black Panther Party. Nine people were in the apartment. Two were killed in the gunfire which broke out: [P. 1]

\* \* \* \* \*

The Grand Jury believes the facts show that the State's Attorney's Police are neither trained nor equipped for such major undertakings.

"The problems inherent in using the State's Attorney's Police in this way are readily apparent. It was never clear who was responsible for the crime scene, either its search or its security. Police department officials say the State's Attorney's Officers had the responsibility because it was their raid, and the police department only provided assistance as requested. The State's Attorney said that when the Police Crime Laboratory men arrived, the whole scene was their responsibility. As a result, no gun was tagged or fingerprinted, no record made of where it was found, no proper inventory was made and no record shows what ammunition was in each, if any. The scene was abandoned by 7:30 a. m. through an unexplainable series of conflicting orders. The failure to collect and systematically preserve available evidence has contributed to the Grand Jury's inability to establish what took place with legal definitiveness.

"Moreover, the whole concept of going on a raid in a high crime density area to obtain weapons from known militants —led by a convicted felon believed to be dangerous—with only fourteen men, in plainclothes, in the dead of night, with no sound equipment, no lighting equipment, no tear gas and no plan for dealing with potential resistance, seems ill-conceived. The Grand Jury believes that a professional police department would not have adopted such an approach but would have used a system similar to the one used by the FBI in June 1969, evacuating the entire Panther Headquarters and effecting eight arrests without firing a single shot." (Pp. 113–114.)

8. Tr. C457 (testimony of agent Hulswit, quoted in government's brief at p. 9).

9. Tr. C455.

10. In McClure v. United States, 332 F.2d 19, 21–22 (9th Cir. 1964), cert. denied,

As the government emphasizes, the record clearly establishes that the agents had announced their office. For that reason, the holdings in *Sabbath* and *Miller* are inapplicable.[11] Moreover, as the government also argues, there is conflict in the testimony relating to the time between the officers' announcement and their actual entry.[12] Nevertheless, none testified that he considered the interval long enough to justify the inference that admittance had been expressly or con-

380 U.S. 945, 85 S.Ct. 1027, 13 L.Ed.2d 963, the following facts were held to constitute a refusal to admit even though only four or five seconds had elapsed:

"In execution of the warrants several officers, some with guns drawn, proceeded up the front stairs of Gaxiola's house about six o'clock in the evening of March 22, 1962. Other officers were at the same time at the rear of the house. Before reaching the front door the officers had to pass by a bay window in the front of the Gaxiola house and as they did so were observed by Mrs. Gaxiola, mother of appellant. Agent Fahey, who was in the lead, testified that when Mrs. Gaxiola observed him she 'turned to run or turned and did run'. When Fahey reached the front door he beat upon it and yelled, 'We are federal officers and have a search warrant, open up'. Fahey then heard 'footsteps running in the wrong direction' and felt certain that the inmates were endeavoring to escape. He then kicked the door open to gain entrance. The total time spent by Fahey at the top of the stairs was four or five seconds; as Fahey testified, 'long enough that I decided it was foolish to wait longer'.

"When the entrance was made it was evident that Mrs. Gaxiola had been approaching the door because she was standing near it when the officers gained entrance. The agents rushed past her into the house, seized Gaxiola, searched him, and recovered the incriminating currency."

The Third and Fifth Circuits have reached the same conclusion on somewhat similar facts—the occupant was seen running away from the door. United States v. Augello, 368 F.2d 692, 693–694 (3rd Cir. 1966), reversed on other grounds, 390 U.S. 200, 88 S.Ct. 900, 19 L.Ed. 2d 1036; United States v. Aldrete, 414 F.2d 238, 239 (5th Cir. 1969); see also United States v. Squella-Avendano, 447 F.2d 575, 584 (5th Cir. 1971). The Ninth Circuit has also recognized the "fleeing footsteps" justification. Stamps v. United States, 436 F.2d 1059, 1060 (1971). Here, however, the agents nei-ther saw anyone going away from the door nor heard any "fleeing footsteps." They had no basis for concluding that they were refused admittance. Also, the mere possibility of escape may not be a sufficient justification in this circuit, absent a time lapse sufficient to justify an inference or refusal, if the door through which escape might be made is also guarded as it was in the case at bar. See United States v. Case, 435 F.2d 766, 770 (7th Cir. 1970). *Cf.* United States v. Chambers, 382 F.2d 910, 916 (6th Cir. 1967).

11. Other cases cited by the government are inapposite. United States v. Mendoza, 433 F.2d 891, 895–896 (5th Cir. 1970), cert. denied, 401 U.S. 943, 91 S.Ct. 953, 28 L.Ed.2d 225 (agents met owner in driveway and proceeded to house with him, another agent knocked several times and entered on hearing his colleague and owner approach); United States v. Poppitt, 327 F.Supp. 73, 78–80 (D.Del.1964) (defendant seen standing near door but making no apparent attempt to respond to knock though she had ample opportunity to do so); Masiello v. United States, 115 U.S.App.D.C. 57, 317 F.2d 121, 122–123 (1963) (knocks, 10 to 30 second wait, second knock, 10 to 20 second wait, noises indicating destruction of evidence heard).

12. On direct examination one of the agents estimated the interval as 30 seconds; that testimony, however, was qualified on cross-examination. Although the narrative description of the sequence of events makes it extremely unlikely that a period of as long as 30 seconds actually elapsed, our holding is not predicated on any particular assumption with respect to the precise length of the time interval. Rather, it is predicated on the undisputed fact that the entry preceded any determination by the agents themselves that action was required either by exigent circumstances or by a reasonable interpretation of the delay as constituting a refusal to admit. Under any interpretation of the evidence, the delay was substantially shorter than that approved in United States v. Viale, 312 F.2d 595, 602 n. 6 (2d Cir. 1963).

structively refused.[13] On the contrary, two agents expressly testified that they had not intended to enter so soon; surprisingly, the door opened when the knob was turned and they abruptly plunged into the livingroom with guns drawn. In short, without an overly hasty purpose, the constables blundered.

The price which society must pay to forestall the repetition of such blunders is that the accused shall go free, or at least at his trial the evidence seized as a result of that invasion of his home may not be used against him.[14] Otherwise the congressional requirement of professionalism in the execution of search warrants might not accomplish its dual purpose of protecting the privacy of the home[15] and ensuring a high degree of expertise in the performance of a vital police function.[16]

## III.

As the parties recognized at oral argument, if the case should be retried, our decision in United States v. Castro, 438 F.2d 468, 470–471 (1971), will obviate any necessity for reference to the Marihuana Tax Act, 26 U.S.C. § 4741, et seq., in the instructions to the jury or in the examination of witnesses.[17] Moreover, although the mandatory five-year sentence imposed by the district court was in compliance with the statute, as we have construed the Comprehensive Drug Abuse Prevention and Control Act of 1970, 84 Stat. 1236, on retrial, the court will have discretion not available prior to May 1, 1971. See United States v. McGarr, 461 F.2d 1 (7th Cir. 1972).

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

13. A significant time lapse has been held to justify a conclusion that admittance was refused. United States v. Woodring, 444 F.2d 749, 751 (9th Cir. 1971) (one minute wait); United States v. Hanna, 260 F.Supp. 430, 432, 434 (S.D.Fla.1966), reversed on other grounds, 393 F.2d 700, affirmed on rehearing, 404 F.2d 405 (5th Cir. 1968) (one minute and 15 second wait); United States v. Whiting, 311 F.2d 191, 195 (4th Cir. 1962), cert. denied, 372 U.S. 935, 83 S.Ct. 882, 9 L.Ed. 2d 766 (one minute wait and other factors).

14. Although he rejected the exclusionary rule, Judge Cardozo's terse summary of its consequence is classic:
"The criminal is to go free because the constable has blundered." People v. Defore, 242 N.Y. 13, 150 N.E. 585, 587 (1926).

15. In Miller v. United States, the Court quoted the following remarks attributed to William Pitt:
" 'The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the

threshold of the ruined tenement.' " 357 U.S. 301, 307, 78 S.Ct. 1190, 1195, 2 L.Ed.2d 1332.

16. The Court has also reminded us that strict compliance with the statute is a protection to the safety of the arresting officers and to the effective accomplishment of their mission. See Miller v. United States, 357 U.S. 301, 313 n. 12, 78 S.Ct. 1190, 2 L.Ed.2d 1332; McDonald v. United States, 335 U.S. 451, 460–461, 69 S.Ct. 191, 93 L.Ed. 153 (Mr. Justice Jackson concurring).

17. Although we did not expressly discuss the "intent to defraud the United States" language of § 176a in Castro, we think it is apparent from that opinion that, when there is appropriate evidence as there is in this case, the trier of fact may legitimately infer that the "receiving" or "concealing" of uninvoiced marihuana which is known to be uninvoiced (that is, known to be imported contrary to law) is done with an "intent to defraud the United States." The "fraud" arises in denying the United States something to which it is entitled—to have marihuana invoiced. The United States is defrauded when such marihuana is received and concealed without invoicing.