**UNITED STATES of America,**
**Plaintiff,**

v.

**Arthur William DOERING,**
**Defendant.**

**No. G–74–73 Cr.**

United States District Court,
W. D. Michigan, S. D.

Nov. 18, 1974.

**1308**

———◆———

J. Terrance Dillon, Asst. U. S. Atty., Grand Rapids, Mich., for plaintiff.

James M. Catchick, Grand Rapids, Mich., for defendant.

### OPINION AND ORDER

FOX, Chief Judge.

Surveillance of the defendant on April 9, 1974 began some time around 3:10 P.M., when the defendant, with an elderly lady, picked up the two red chairs at the Muskegon County Airport. The chairs had been inspected and a powder obtained, identified as cocaine, by drilling a hole in the chair.

The defendant was followed to Grand Rapids. The elderly passenger got out of the van before it reached 341 Hobart Street. When defendant arrived at the Hobart address, he took the crated chairs into the detached garage. That occurred at approximately 4:30 P.M.

At that time, agent Young, of the Drug Enforcement Administration, and a customs inspector, set out for the Federal Building to obtain a warrant authorizing a search of the garage at 341 Hobart. They returned around 6:35 P.M., after having secured the warrant from Judge Fox.

Between 4:30 P.M. and 6:30 P.M., the defendant had taken the van and left the Hobart address. Agent Robbins followed the defendant, leaving one officer to continue observation of the garage.

Agent Young obtained the warrant in order to search the garage. Upon returning with the warrant, the defendant was observed transferring the two chairs from the garage to the house. After discussing the situation, the decision was made to "hit it" at that time rather than wait for a second warrant.

There are several issues as to the validity of the search; either with a warrant or without it. The court does not have to settle all these problems. Assuming the officers had the *right* to search the house, the manner in which the entry was made requires that the fruits of the search be suppressed. That conclusion is made necessary, if not by the Constitution, then by 18 U. S.C. § 3109.[1] That section provides:

"The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, *if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.*" (Emphasis supplied.)

I find the following to be the facts: When the decision was made to go, the agents were advised "Let's go" (or something similar). Some drove their cars up towards the front of the house, got out and ran to the house. Others, already out of their cars, charged from their observation points. And that is what it was—a "charge." They went to the two doors, four to six officers at each door.

At this time, inside the house were Arthur L. Doering, Arthur C. Doering, Max Doering and Lena Doering. Arthur L. Doering is 83 years old. Lena his wife, is 86 years old. Arthur C. and Max are their sons. Arthur W. Doering, the defendant, was in the basement. He is the grandson of Arthur L. and Lena.

Lena Doering saw some men get out of their cars and go running. When she saw them cross the neighbor's driveway, her driveway, and then in front of the dining room window, she left the kitchen and went to the living room. She heard yelling and pounding; then the oak door was broken down. She stopped about eight feet from the door.

---

1. I do not need to decide whether the Fourth Amendment's proscription against unreasonable searches was violated.

She was frozen with fear. Had she gone much closer, she could have been seriously injured.[2]

Testimony of the occupants of the house is as consistent as can be expected, under the circumstances, with respect to what happened (though Max Doering said Lena was sitting at the table and not in the kitchen) and the time period involved. Their story is that persons ran by the window. Then there was a loud banging and the door was broken down. None heard any yells or knocks which could be identified as coming from the side door. None could hear what the officers outside were saying, if voices could be distinguished at all. When the front door was broken down, officers entered, with guns drawn, and proceeded to search the house. They went to the basement when told the two red chairs were there.

Agent Robbins testified he went to the side door, pounded on the outside door (one to three times), yelled "Federal agent with search warrant," heard noises at the front, and entered the unlocked door.

Meanwhile, at the front door, city officer Fowler testified he pounded twice on the door, shouted "police officers," looked in the door window and saw no one; heard someone from the front or side say "we're going in the side;" then he kicked in the oak door and confronted Lena Doering, who was at that time in the living room.

Testimony, as to the time period involved, varied. The time from the first noise at the front until the door was broken down was estimated to run from being instantaneous to 15–20 seconds. For those being invaded the time seemed short. For those "charging," it probably seemed forever. The testimony of all the occupants is credible and convincing, with the greatest weight being placed on Mrs. Doering's testimony.

The court finds that the knocking and breaking in of the door were virtually simultaneous. Mrs. Doering started moving to the living room when she saw the men go by. She testified she "skipped." The court observed Mrs. Doering and she has no difficulty in moving around. It certainly did not take her 15–20 seconds, though it could have been 2–3 seconds.

Clearly visible, for all eyes to see, was the inside of the dining room in which the elder male Doerings were sitting. The court finds that the officers at the front and sides charged simultaneously and immediately entered. They did identify themselves (probably at the same time at both doors), but they did not give the occupants an opportunity to respond to the notification. At the side, Robbins said he entered when he heard noise from the front. And at the front, they entered upon hearing that Robbins was going in the side.

Both entries are the type to which the requirements of 18 USC § 3109 apply. Sabbath v. United States, 391 U.S. 585, 589–590, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968); United States v. Bustamante-Gamez, 488 F.2d 4, 9 (9th Cir. 1973), cert. denied, 416 U.S. 970, 94 S.Ct. 1993 40 L.Ed.2d 559 (1974). The Seventh Circuit Court of Appeals, collecting many of the cases dealing with § 3109, noted "that although the issue is one of statutory construction, rather than constitutional law, the Anglo-American tradition of respect for the privacy of the home and the dignity of the citizen even when suspected of criminal behavior forecloses a 'grudging application' of the statute. [Citing Sabbath, supra]." United States v. Pratter, 465 F.2d 227, 230 (1972).

As Judge Duniway pointed out in Bustamante-Gamez, three interests are served by the statute:

"(1) it reduces the potential for violence to both the police officers

2. The court, accompanied by the attorneys, court reporter, and the defendant, viewed the premises with the permission of the elder Doerings. The Judge stood behind Mrs. Doering as she explained the assembly and charge by the officers and her action in entering the living room. Her testimony at the house was extremely credible and contains the evidence given the greatest weight by the court.

and the occupants of the house into which entry is sought; (2) it guards against the needless destruction of private property; and (3) it symbolizes the respect for individual privacy summarized in the adage that 'a man's house is his castle.'" 488 F.2d at 9.

In Pratter, supra, the court found dual purposes in the congressional requirement: "protecting the privacy of the home and ensuring a high degree of expertise in the performance of a vital police function." 465 F.2d at 233. That court also noted that safety, of officers as well as civilians, may be better advanced by compliance with the statute. Id. n. 16.

Still, the court in Bustamante-Gamez concluded that when there is some indication of exigent circumstances, it is reasonable to allow entry upon announcement only.

> "[E]ntry is permissible simultaneously with or shortly after announcement if there is a likelihood that the occupants will attempt to escape, resist, destroy evidence, or harm someone within *and* if a nonforcible entry is possible; more specific inferences of exigency are necessary if entry may be obtained only by the physical destruction of property; an explicit refusal of admittance or lapse of a significant amount of time is necessary if the officers have no facts indicating exigency." 488 F.2d at 12.

In United States v. Chambers, 382 F.2d 910 (1967), the Sixth Circuit Court of Appeals considered § 3109. There, an arrest was involved, but the requirements of § 3109 have been applied to an arrest in the same manner as to a search. Sabbath v. United States, 391 U.S. at 588, 88 S.Ct. 1755; Chambers supra, 382 F.2d at 916, n. 4. The court held that refusal of admittance is not limited to an affirmative refusal and the length of time officers must wait will vary with the circumstances.

In Chambers, the court found that the circumstances were sufficient to warrant the agents' forcible entry. But there, the defendant had come to the door and retreated after seeing the agents. In addition, the house was known to be used exclusively for the purpose of prostitution. "They had good reason to believe that the persons for whom they had arrest warrants were in the house and that the suspects might resist arrest or attempt an escape." 382 F.2d at 916. It is significant to note that the court further stated that "[h]ad this been an ordinary home, a retreat from the door might have been a more ambiguous movement. . . ." Id. Our case involves an ordinary house with no conduct by the occupants which could be said to be even ambiguously suspect, at least as to grounds for not complying with the statute.

■ I am of the view that § 3109 should not be emasculated by minimizing the importance of one's right to privacy, and allowing entry simply upon identification and notice of purpose.[3] In the absence of exigent circumstances, the agents must at least give an opportunity to respond, though as Chambers noted, an affirmative refusal to admit is not required and the waiting time will necessarily vary with the circumstances.

■ Other than the fact that drugs were involved, the court finds that there were no other circumstances which would justify the entries in this case. And the mere presence of drugs,[4] with-

---

3. It is not obvious that Bustamante-Gamez would do so either. Though the opinion is unclear at that point, the court seems to require an objective basis for concluding exigency. 488 F.2d at 12, cf. Terry v. Ohio, 392 U.S. 1, 21–22, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (decided one week after Sabbath). To the extent to which the Ninth Circuit does not require such an objective basis, I do not follow it. Though Sabbath

considered *unannounced* entry, and is thus distinguishable, the Court clearly required that agents have a substantial basis for not complying with the statute. It can be noted that cocaine was also the substance involved in that case.

4. Compare 21 U.S.C. § 879, which deals with execution of a search warrant relating to

out more, is not enough. Cf. Heaton v. Commonwealth, 207 S.E.2d 829 (Va. Sup.Ct., 1974); Kamisar, LaFave and Israel, Modern Criminal Procedure (4th ed. 1974) 261–62, 277–78.

It is significant to note that when the entries were made, no arrests were intended. Unless they found evidence that the cocaine was being retrieved, Robbins testified that no arrests would probably be made. There was no testimony to the effect that any of the occupants were previously known to the police as being involved in the business of illicit drugs or known to be dangerous.

No testimony was given by any of the officers to the effect that *they* thought they *had* to enter the house without giving the occupants a chance to respond in order to preserve evidence or for their safety. Certainly, they were concerned, as Robbins testified, with securing the house, for their safety, and the preservation of the evidence, but that is always the case in a search. No one testified that there was any special concern for the search in this case.

The government contends that if there are two entries, a valid entry is not tainted by an invalid entry, at least if the valid entry came first. Here the claim is that the side entry was first and valid.

■ The court does not have to decide whether the legal proposition is correct, since I hold that the side entry was also unreasonable. The officers did not give sufficient time for response. Robbins arrived, knocked, called out his identity, heard some noise at the front (he could not identity what the noise was), and entered. The court finds that Robbins'

knocking, identification and entry were virtually simultaneous.

The officers could have looked in the dining room windows to determine if anyone was close enough to the doors to respond to an announcement. It would seem to be the safe and reasonable thing to do. They could have rung the door bell, but they did not. Instead, in the haste and emotion of the moment, they just kept charging.

The only fact which the government points to as creating exigent circumstances is that one "suspicious car" was seen by the officers. The identity of the driver was not so important as to cause the agents to determine who he was, even after the search. (The car was not even mentioned in Robbins' April 12 report.) The government claims the officers thought the car might warn the occupants of the stake-out. That may be sufficient, in view of the other circumstances of the surveillance, to justify searching without a proper warrant. But it does not justify this type of entry. The only reason for not waiting for another warrant was in order to search before the driver could give warning.

I also note that after the warrant was obtained and the agents were back on the site, defendant was in the garage with the chairs for a period of five to ten minutes. The warrant could have been executed at that time. Had that been done, the agents, as the government attorney admits, would not have feared disposal of the contraband. Neither would the "suspicious car" have posed a threat of warning. And no doors would have been broken down.

felonies involving controlled substances. In essence, it provides that 18 U.S.C. § 3109 is not applicable when the magistrate issuing the warrant:

"(1) is satisfied that there is probable cause to believe that (A) the property sought may, and, if such notice is given, *will* be easily and quickly destroyed or disposed of, or (B) the giving of such notice will immediately endanger the life or safety of the executing officer or another person, and (2) has included in the warrant a direction that the officer executing it shall not be required to give such notice." (Emphasis supplied.)

This statute has now been repealed [Senate Bill 3355, signed by the President October 26, 1974], at least partially because of the abuses which have occurred during some of the authorized raids.

**1312**

The officers charged, announced their presence, and entered without giving the occupants a reasonable opportunity to respond. The statute requires a "refusal to admit" before entering. While exigent circumstances may justify immediate entry, such circumstances did not exist here. The approaches and entries through the two doors were meant to be and were virtually simultaneous. In neither instance was a reasonable time given to respond.

The motion to suppress is granted.

It is so ordered.