Craig A. WILLIAMS, Appellant,

v.

UNITED STATES, Appellee.

No. 88–1549.

District of Columbia Court of Appeals.

Argued April 23, 1990.
Decided June 15, 1990.

Allen W. Levy, Public Defender Service, with whom James Klein, Public Defender Service, Washington, D.C., was on the brief, for appellant.

James A. Meade, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and N. Paul Patterson and John R. Fisher, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before ROGERS, Chief Judge, and NEWMAN and BELSON, Associate Judges.

ROGERS, Chief Judge:

 Appellant appeals his conviction of possession of an unregistered firearm, ammunition and drug paraphernalia, D.C.Code §§ 6–2311(a), –2361(3) (1989 Repl.) and 33–603(a) (1988 Repl.), on the ground that the physical evidence should have been suppressed since it was discovered during a search that violated the District of Columbia's "knock and announce" statute, D.C.

Code § 33–565(g) (1988 Repl.). The trial judge found that exigent circumstances justified the police action. We affirm.[1]

## I.

A search warrant for 1465 Morris Road, S.E., was issued based on information obtained by Inspector Shirk from a confidential source who made a controlled purchase of drugs at that location about which the police had been receiving complaints for six months. The informant, while watched by Investigator Shirk, entered the house on January 7, 1988, and emerged fifteen minutes later with a plastic bag containing rock cocaine. The informant told Investigator Shirk that in addition to drugs, there were several weapons in the house and that a man armed with an automatic gun was seated in the living room next to the front window.

Because of the suspected presence of automatic weapons, Investigator Shirk sought the assistance of the Emergency Response Team (ERT) in executing the search warrant. On January 12, 1988, around 9:00 p.m., the ERT officers and others, all in police uniform, having been briefed on the types and locations of weapons expected to be in the house, drove to the house in a marked police van. Lieutenant Pope, the supervisor of the ERT team, followed in a marked police car.

The police vehicles stopped a few doors short of 1465 Morris Road in order to minimize the chances of being seen. As the vehicles pulled over to the curb, on the wrong side of the street, Shirk and Pope saw a man come out of the house, look in

---

1. For the first time on appeal, the government contends that appellant does not have standing to suppress the evidence retrieved during the search. Issues not raised at trial generally will not be considered by this court, *Sparks v. United States,* 358 A.2d 307 (D.C.1976), and we see no reason to deviate from this general rule where we affirm the trial judge's decision not to suppress the evidence. *See also Steagald v. United States,* 451 U.S. 204, 209, 101 S.Ct. 1642, 1646, 68 L.Ed.2d 38 (1981) (government, through its assertions, concessions, and acquiescence in the courts below lost right to raise for first time in the Supreme Court factual issues which challenge petitioner's standing); *United States v.*

*Ford,* 525 F.2d 1308, 1310 (10th Cir.1975) (government cannot challenge standing in Fourth Amendment case for first time on appeal); *Wilderberger v. State,* 74 Md.App. 107, 119 n. 7, 536 A.2d 718, 723 n. 7 (1988). The government's reliance on *Combs v. United States,* 408 U.S. 224, 227–28, 92 S.Ct. 2284, 2286, 33 L.Ed.2d 308 (1972), is misplaced since that case stands simply for the proposition that a defendant must be given an opportunity to establish standing before the appellate court can affirm the trial court's decision on the basis of the defendant's lack of standing where the government first raised the issue of standing in the defendant's direct appeal.

their direction, and run back inside. Pope testified that he heard the man yell in a loud voice "police officers, police officers," or similar words, as he reentered the house, slamming the door.[2] Shirk told the van driver that they had been seen. Pope also warned the ERT team over the radio that they had been observed by someone inside the house.[3] Officer Williams, a member of the ERT team, testified that prior to the van stopping she heard Pope's radio transmission that they had been seen. Officer Muslim, another ERT officer, heard Shirk warn the driver they had been spotted and also heard Pope "yell[ing] something to the effect that they spotted us." [4]

As Shirk got out of the van and approached the house, the ERT team ran from the back of the van to the door of the house. Officer Muslim, carrying a body shield, went ahead, knocked on the door, and then placed the shield up against the window, which was almost adjacent to the door, about 12 inches away. When Muslim knocked on the door and announced police, we have a search warrant, he heard "some scrambling and noise on the inside of the building like one was running actually upstairs or through the house."

Sergeant Exum, the entry team leader, who had a battering ram, followed with other officers; according to Inspector Pope, Exum announced "in a loud and clear voice, police officer, we have a search warrant, waited a very short period of time at which point the door was struck with a ram." Pope estimated that the officers waited about three seconds before ramming the door: "approximately 3 to 5 seconds, at the most" having passed since Muslim knocked and Exum announced.[5] Approximately 10 seconds elapsed between the time the man who saw the police sounded the alarm and when Officer Muslim knocked on the door.

As the police officers entered, they saw a stool by the front door [6] and appellant sitting alone at the dining room table, facing toward the window of the living room, near two loaded handguns in plain view and several items of narcotics paraphernalia. A search of appellant yielded a plastic bag containing cocaine and $45 cash. A jacket in the dining room with appellant's identification contained several rounds of ammunition.

Appellant filed a motion to suppress the physical evidence on the ground that the search was illegal since the police had failed to wait long enough between the announcement of their presence and their forced entry. He further argued that any information obtained by the police before arriving at the scene should be disregarded in determining whether exigent circumstances justified their entry. The trial judge agreed that the police had failed to wait a reasonable time before entering the premises, and thus had violated the knock and announce statute, but denied the motion to suppress on the ground that exigent circumstances justified the police officers'

---

**2.** In response to questions by the trial judge, Inspector Pope explained that while his car window was open, the ERT officers in the van would not have heard the man yelling because the van remains closed until it approaches the location, and then opens only in the rear. Shirk did not hear the man call out police, but explained that when he saw the man he (Shirk) was opening the sliding door of the van and the noise of the door might have covered any sound that the man might have made; had he (Shirk) been in the street, he thought he would have heard anything that the man had said.

**3.** Pope testified that all ERT officers had radios and that he broadcast the warning while the other officers were still inside the van, as it was braking. He also testified that it was standard procedure to check the radios before going out and for officers to have their radios on.

**4.** Muslim testified that Pope was yelling out loud while he was outside of his car about five feet from the rear of the van. Although Muslim was wearing a radio, he did not use it for the initial entry, and could not recall whether anyone had tried to communicate with him over the radio prior to his entry into the house.

**5.** Officer Muslim thought that four or five seconds elapsed between the time he knocked and announced and when Exum came to the door with the battering ram.

**6.** Inspector Pope testified that he was told before going to the house that "a subject would be sitting on a stool at the front window with a weapon for protection of the premises."

entry. The judge found that the police reasonably believed that drugs were being sold in the house, that the house was guarded by a man with an automatic gun at the front window, and that the occupants had been alerted to their arrival.

## II.

■ D.C.Code § 33–565(g) (1988 Repl.) provides:

The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute the warrant, if, after notice of his authority and purpose, he is refused admittance.

Knock and announce statutes codify the common law rule that the police may not forcibly enter a person's house without prior announcement. *Miller v. United States,* 357 U.S. 301, 308, 78 S.Ct. 1190, 1195, 2 L.Ed.2d 1332 (1958) (applying District of Columbia law which was identical to the federal statute, and citing *Semayne's Case,* 77 Eng. Rep. 194 (1603)). The rule serves the important purposes of protecting the individual's right of privacy in his or her home, and of protecting police officers against unwarranted danger and encouraging police safety. *Id.* 357 U.S. at 308, 313, 78 S.Ct. at 1198; *Brooks v. United States,* 263 A.2d 45, 47 (D.C.1970). *See, e.g., United States v. Bustamante–Gamez,* 488 F.2d 4, 9 (9th Cir.1973), *cert. denied,* 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974).

The District of Columbia statute is identical to the federal knock and announce statute, 18 U.S.C. § 3109, which has been applied to a broad range of exigent circumstances, including the destruction of evidence and danger to entering police officers.[7] The federal circuit courts of appeal have construed the statute to encompass two broad exceptions. These exceptions stem from situations in which compliance with the knock and announce requirements would be a mere ritual or are excused because of the exigencies of law enforcement. *Bustamante–Gamez, supra,* 488 F.2d at 10. Under the first exception, the police need not wait for the occupants affirmatively to refuse them admittance if the police can reasonably infer from the actions or inactions of the occupants that they have been constructively refused admittance; under these circumstances, the police may force their entry without delay. *Bonner, supra* note 7, 277 U.S.App.D.C. at 273, 874 F.2d at 824 (*citing United States v. James,* 528 F.2d 999, 1017 (5th Cir.), *cert. denied,* 429 U.S. 959, 97 S.Ct. 382, 50 L.Ed.2d 326 (1976) (a very brief time is a reasonable time)). Under the second exception, if the police are confronted with "exigent" circumstances, such as the imminent destruction of evidence, *Masiello II, supra* note 7, 115 U.S.App.D.C. 57, 317 F.2d 121, or some danger to the entering officers, *Bonner, supra* note 7, 277 U.S.App.D.C. at 275–76, 874 F.2d at 826–27; *Harris, supra* note 7, 140 U.S.App.D.C. 270, 435 F.2d 74; *see United States v. Curtis,* 138 U.S.App.D.C. 360, 427 F.2d 630 (1970) (en banc) (entry justified by defendant's attempted flight), then they may force their entry without fully complying with the knock and announce statute. *See Miller, supra,* 357 U.S. at 309, 78 S.Ct. at 1196; *Masiello v. United States,* 113 U.S.App.D.C. 32, 304 F.2d 399 (1962) (recognizing exigent circumstances qualification to § 3109) (*Masiello I*); *United States v. Wylie,* 149 U.S. App.D.C. 283, 462 F.2d 1178 (1972) (same).

In reviewing appellant's challenge to the trial judge's finding of exigent circumstances, this court must afford the government "all legitimate inferences from the testimony and uncontroverted facts of record" and "must accept the inferences drawn by the trial court as to the facts before it, if they are supportable under any view of the evidence." *United States v. Covington,* 385 A.2d 164, 166 (D.C.1978) (quoting *Scarbeck v. United States,* 115 U.S.App.D.C. 135, 155, 317 F.2d 546, 562, *cert. denied,* 374 U.S. 856, 83 S.Ct. 1897, 10 L.Ed.2d 1077 (1963)). *See Bonner, supra*

---

7. *See, e.g., United States v. Bonner,* 277 U.S.App. D.C. 271, 275, 874 F.2d 822, 826 (1989) (citing *United States v. Harris,* 140 U.S.App.D.C. 270, 435 F.2d 74 (1970), *cert. denied,* 402 U.S. 986, 91 S.Ct. 1675, 29 L.Ed.2d 152 (1971), and *Masiello v. United States,* 115 U.S.App.D.C. 57, 317 F.2d 121 (1963) (*Masiello II*)).

note [7], 277 U.S.App.D.C. at 278–79, 874 F.2d at 829–30 (the trial court's conclusion on exigency, without findings, is to be upheld "if there is any reasonable view of the evidence to support it") (quoting *United States v. Lindsay*, 165 U.S.App.D.C. 105, 109, 506 F.2d 166, 170 (1974)); *Wylie, supra*, 149 U.S.App.D.C. at 288–89, 295, 462 F.2d at 1183–84, 1190. The ultimate question facing the trial court was how a reasonable police officer would respond to the circumstances. *Bonner, supra* note 7, 277 U.S.App.D.C. at 278, 874 F.2d at 829.

The trial judge relied on five discrete findings in concluding that exigent circumstances justified the officers' failure to wait a reasonable amount of time before forcing their entry. First, the judge "credit[ed] Investigator Shirk's testimony that he had obtained a search warrant arising out of a controlled buy conducted a week beforehand." Second, he credited Shirk's testimony that the person sent to buy drugs had reported that "there were arms in the house" and that "someone [was] sitting on a stool at a window by the door with an automatic weapon, maintaining guard." The judge observed that Shirk thus had "information at that point that any execution of a search warrant in there held a real potential for danger for officers who would be entering the premises." Third, the judge was satisfied that Shirk had briefed the ERT officers beforehand of "what he knew was a potential danger from within that house." Fourth, while noting "some conflict in the testimony as to someone opening the door and looking out before the raid," the judge found that Shirk and Pope "were in a position to see that person ... and did see someone." Fifth, although there was "some inconsistency in the testimony as to whether Lieutenant Pope made an announcement over the radio broadcasting [ ] that the police had been seen, or whether he stood outside and yelled it," the judge noted that Officer Muslim testified that he heard Shirk mention they had been seen just before they got out of the truck.

Combining the evidence that the police had been spotted and the earlier information from Shirk, "plus the circumstances immediately before of getting up on the steps of that house and knocking and breaking and entering," the judge ruled that the circumstances justified the immediate entry after announcement. First, from prior experience the police knew that this was a place where there were drugs and weapons, so that "any pause, or delay could conceivably result in destruction of evidence." Second, as an even "greater justification for entering ... [, the police] had indications that someone inside that place was armed ... [and when the police informant had been there, someone] was, in fact, seated in a guarding position with an automatic weapon at the window next to the door." Accordingly, the judge denied the motion to suppress.

■■■ On appeal appellant asserts a broad array of challenges to the trial judge's finding of exigency, but, as we will discuss, each is found wanting. First, appellant challenges the reliability and timeliness of the information contained in the search warrant since the search was executed five days after the warrant was issued. However, under D.C.Code § 33–565(i) (1989 Repl.), a search warrant may be served up to ten days after issuance. The issuance of a warrant therefore signifies that a judicial officer has made a determination that there are reasonable grounds to believe that the information underlying the warrant is true and is of sufficient reliability and timeliness to justify a search for up to ten days. *See Masiello II, supra* note 7, 115 U.S.App. D.C. at 59, 317 F.2d at 123; *Bonner, supra* note 7, 277 U.S.App.D.C. at 274, 874 F.2d at 825 ("the warrant process has tested and certified this information"). Nothing in the nature of the activity at 1465 Morris Road, S.E. underlying the warrant suggests that the information had become stale. Not only had there been long-standing complaints to the police about activities in the house,[8] but the reaction of the man who

---

**8.** Investigator Shirk testified about complaints over a six month period concerning narcotics activity at the house. Inspector Pope testified that the ERT team was advised that narcotics

came out of the house and spotted the police reinforced the judicial officer's determination of timeliness.

■ Second, appellant relies on the legislative history of the District of Columbia's knock and announce statute and the repeal of the "no-knock" law [9] as evidence that Congress intended that only danger which is evident at the time of the search, and not some time earlier (such as that arising from facts discovered and included in a five-day-old search warrant), can form the basis for exigent circumstances justifying immediate forced entry. Actually, the legislative history relied on by appellant shows only that after the repeal, no-knock searches are "permitted only when exigent circumstances become known to the Government agents immediately prior to their contemplated search." 120 Cong.Rec. 35904 (1974). This is fully consistent with the trial judge's findings. Of course, the nature of the suspected activity in the house and the presence of guns therein can hardly be deemed a one-time activity or circumstances free of danger for the entering police. *See Bonner, supra* note 7, 277 U.S.App.D.C. at 273, 874 F.2d at 824 (those within "a den of drug traffickers ... might reasonably be thought to be unusually attuned to a law enforcement knock at the door, and ready to respond promptly one way or another."). But here the trial judge credited Shirk's and Pope's testimony that they saw a man who went back into the house to warn that the police had arrived, and this circumstance supplied the added, immediate danger for the officers who would execute the search warrant.

Although the trial judge did not make a specific finding that the warning that they had been spotted was communicated to Sergeant Exum, who had the battering ram,

the finding was clearly implicit. Pope testified that all members of the ERT team had radios and that he had said on the radio transmission at least twice that they had been spotted. The ERT officers were in the truck together when Pope sounded the alarm and when Shirk commented that they had been seen. The ERT officers operated as a team, running together toward the house, with Pope and Shirk behind according to Pope; Muslim was first at the door, Exum was second with Williams and Ayala directly behind him. Muslim and Williams testified that they heard the warnings that the police had been spotted as they were leaving the truck and, thus, approached the house aware that the occupants knew of their arrival.[10] Given the potentially dangerous circumstances of an armed lookout inside a house in which drugs are sold, it is inconceivable that the officers would not have shared the information with their team leader that they had been spotted by an occupant of the house seconds before the police knocked and announced themselves and requested entry. *See Daniels v. United States*, 129 U.S.App.D.C. 250, 252, 393 F.2d 359, 361 (1968) (in view of the strength of the inference raised by testimony in the record, absence of direct proof is not ground for reversal); *cf. Glass v. United States*, 395 A.2d 796, 804 n. 18 (D.C. 1978) ("the inference is inescapable that the required link in the chain of communication is satisfied [since officers having probable cause remained present while others searched car]"); *accord, Clarke v. United States*, 256 A.2d 782, 785 (D.C.1969).

■ Third, appellant maintains that the suspicion of drugs, guns and an armed guard, and the occupants' prior notice of the arrival of the police, even in combina-

---

were both sold and used at the house and that prostitution was performed there by young women in order to buy drugs.

9. The no-knock law, 84 Stat. 630, allowed the police to enter a house without knocking and announcing if they obtained prior court approval and was repealed in 1974. P.L. 93–481, Amendments to the Controlled Substances Act, 88 Stat. 1455.

10. In summarizing his findings, the judge noted that Officer Muslim testified that he had heard Lieutenant Pope yelling that the police had been spotted. The judge was somewhat skeptical that this had occurred. However, mistakenly forgetting Officer Williams' testimony that she had heard Pope's warning on her radio while she was in the truck, the judge thought that no officer had testified about hearing Pope's warning over the radio.

tion, are insufficient to come within an exception to the statutory knock and announce requirements. Even accepting that drugs alone are insufficient, *see, e.g., People v. Gastelo*, 67 Cal.2d 586, 588, 432 P.2d 706, 708, 63 Cal.Rptr. 10, 12 (1976) (en banc) (rejecting blanket rule based on type of crime or evidence produced); *United States v. Rodriguez*, 663 F.Supp. 585, 588 (D.D.C.1987) (*citing State v. Bates*, 120 Ariz. 561, 563, 587 P.2d 747, 749 (1978) (en banc), and *Tatman v. State*, 320 A.2d 750 (Del.1974)), courts have held that the existence of suspected drugs can be relied upon in finding exigent circumstances where there are additional factors to support the conclusion. *E.g., Ker v. California*, 374 U.S. 23, 40, 83 S.Ct. 1623, 1633, 10 L.Ed.2d 726 (1963) (drugs plus furtive behavior before entry); *Bonner, supra* note 7, 277 U.S.App.D.C. 271, 874 F.2d 822 (drugs plus sounds consistent with the destruction of evidence, weapons, and 11–12 seconds of waiting following knock and announce). Here the trial judge's findings—about the potentially dangerous situation of the guard with an automatic gun at the front door of the house where drugs are sold, combined with the man sighting the police arrival and returning to the house—provide the additional factors required to justify the police officers' actions in the instant case. Indeed, the evidence also indicated the likely destruction of evidence immediately following the officers' announcement of their presence. Officer Muslim testified that he heard scrambling noises as if someone was running up stairs after the officers announced their authority and purpose, which lends further support to a finding of exigent circumstances. *United States v. James*, 246 U.S.App.D.C. 252, 255, 764 F.2d 885, 888 (1985) (evidence that police, after knocking and announcing heard someone running down the back stairs was probative of imminent destruction of evidence).

■ Furthermore, the cases relied on by appellant do not suggest that the police *must* see someone squeeze the trigger be-

fore they can reasonably suspect that they might be shot. *See Bonner, supra* note 7, 277 U.S.App.D.C. at 274, 874 F.2d at 825 ("A fusillade of gunfire from within need not mark refusal [of entry]."). Nor must they have specific knowledge that a particular person has previously shot a police officer. One of the important purposes of the knock and announce statute, and the repeal of the no-knock law, is, as appellant recognizes, to protect and encourage police safety. Thus, the exception for exigent circumstances where the police officers' safety is better protected by immediate forced entry, than by rigid adherence to the knock and announce requirement, is in accordance with the values that the knock and announce statute is designed to protect. *See Miller, supra*, 357 U.S. at 309, 78 S.Ct. at 1196; *Bonner, supra* note 7, 277 U.S.App.D.C. at 275, 874 F.2d at 826; *Bustamante–Gamez, supra*, 488 F.2d at 10 (rule is not inflexible). The limitation that "police knowledge of the existence of firearms excuses compliance with announcement requirements only where the officers reasonably believe the weapon will be used against them if they proceed," *People v. Dumas*, 9 Cal.3d 871, 878, 512 P.2d 1208, 1213, 109 Cal.Rptr. 304, 309 (1973), is of no avail to appellant where the police have reliable information that someone is guarding the front door with an automatic gun. A police officer could reasonably perceive a meaningful distinction between someone who is generally known to keep a gun and someone who is known to be guarding a door with an automatic gun, particularly where the latter has been forewarned that the police are coming. The cases relied on by appellant do not support the conclusion that a reasonable propensity to fire on an officer can be shown only where a person is known to have previously shot an approaching officer. *See Dumas, supra*, 9 Cal.3d at 879, 512 P.2d at 1213, 109 Cal. Rptr. at 309 (unannounced entry based on previously obtained information that defendant presently armed and invariably answered door with loaded gun) (citations omitted); [11] *State v. Jeter*, 30 Wash.App.

**11.** In *Dumas*, for example, the court upheld the denial of suppression even though the police

failed to announce their identity and purpose since they had reliable information that the

360, 634 P.2d 312, 314 (1981) (general belief that a convicted felon may have a propensity to use gun in resistance insufficient evidence of exigent circumstances).

■ Finally, appellant's contention that the exit and re-entry of a person into the house shortly before a warrant is executed is insufficient to justify avoidance of the requirements of the knock and announce statute must fail in view of all the other circumstances found by the trial judge. The sight of police officers in uniforms alone can put occupants on notice of their authority and purpose for knock and announce purposes. *Cf. Chappell v. United States,* 119 U.S.App.D.C. 356, 358, 342 F.2d 935, 937 (1965) (police uniform indicated police authority). *See United States v. Tracy,* 835 F.2d 1267, 1270 (8th Cir.), *cert. denied,* 486 U.S. 1014, 108 S.Ct. 1750, 100 L.Ed.2d 212 (1988).[12] Here the advance notice given to the occupants by the man who stepped out and immediately returned to the house, and who was heard to yell "police officers," or the equivalent, gave the occupants more time in which to destroy evidence and to prepare to defend themselves against the police, thereby increasing the danger. *See Bonner, supra* note 7, 277 U.S.App.D.C. at 276, 874 F.2d at 827 (danger to officers and possibility of destruction increased once the officers announced their identity). Even so, the police knocked and announced their authority and purpose and then waited a few seconds more, for approximately 10 seconds after the man had alerted the occupants, before forcing their entry. *See id.* at 275–77, 874 F.2d at 826–28 (degree of exigency needed to justify warrantless search or absence of announcement portion of statute is greater than that needed to excuse noncompliance with the wait for refusal to admit portion) (citations from five circuits omitted).[13]

Accordingly, the judgment is affirmed.

---

defendant not only possessed weapons but "habitually answered the door armed with a firearm." 512 P.2d at 1214.

12. In *Tracy,* the court held that there was no need for the police to announce their purpose after knocking and identifying themselves. The court concluded that the police had reasonable grounds, based on past experience and knowledge of undercover drug sales in the duplex, which was fortified, and the defendants' monitoring of the surrounding area, to conclude that the defendants were anticipating their arrival and knew their purpose. 835 F.2d at 1270. The court also relied on the fact that "the officers could have reasonably believed the announcement would cause evidence to be destroyed before the officers could surmount the anticipated hindrances to their entry and execution of the search warrant." *Id.* (citing *Ker, supra,* 374 U.S. at 47, 83 S.Ct. at 1636 (Brennan, J., concurring and dissenting)).

13. Appellant's reliance on *United States v. Pratter,* 465 F.2d 227 (7th Cir.1972) is misplaced. In *Pratter* the government sought to justify exigency on the basis of a "watchdog in front of the house" that the police officers thought was going to attack one of the agents. In fact, the dog "meandered off before the agents reached the front door." 465 F.2d at 231. The government also relied on the fact that the suspected existence of hashish might be flushed down a toilet before it could be seized. However, the agents had analyzed the hashish and sprayed it with fluorescent dust before letting it be delivered, thus making it unlikely, in the court's view, that criminal activity would go undetected or be unprovable. *Id.* The agents also expressed no concerns about the need for a prompt entry. *Id.*