Bill J. GRIFFIN, Appellant,

v.

UNITED STATES, Appellee.

No. 90–CM–531.

District of Columbia Court of Appeals.

Submitted Oct. 2, 1991.
Decided Dec. 18, 1992.

Andrew J. Delehanty, Washington, DC, appointed by this court, filed a brief for appellant.

Jay B. Stephens, U.S. Atty., and John R. Fisher, Thomas J. Tourish, Jr., Peggy Kuo, and Frederick W. Yette, Asst. U.S. Attys., Washington, DC, filed a brief for appellee.

Before ROGERS, Chief Judge, and TERRY and SCHWELB, Associate Judges.

SCHWELB, Associate Judge:

As a great British prime minister is said to have put it more than two and one quarter centuries ago,

> [e]very [English] man's house [is] his castle[1].... The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement!

*Miller v. United States*, 357 U.S. 301, 307 & n. 7, 78 S.Ct. 1190, 1194 & n. 7, 2 L.Ed.2d 1332 (1958) (quoting William Pitt, the Earl of Chatham). Even where police officers are armed with a search warrant and looking for drugs, they may not forcibly enter a residence unless they have first given notice of their presence and purpose and have then been refused admittance. D.C.Code § 33–565(g) (1988).

In the present case, using a battering ram, officers who were executing a search warrant broke down the door of appellant Bill Griffin's mother's apartment at 1:40 a.m., approximately thirty seconds after they "knocked and announced." They found "crack" cocaine and money. Griffin, a high school student, was arrested and charged with misdemeanor possession of a controlled substance. D.C.Code § 33–541(d) (1988).

Before trial, Griffin moved to suppress the tangible evidence obtained by the police following their forced entry. The trial judge denied the motion, and Griffin was thereafter convicted by a jury. He now appeals, contending that the evidence ought to have been suppressed. We hold that the government failed to prove that the officers had been "refused admittance" after they had given the required notice, and therefore that the evidence was unlawfully seized. Accordingly, we reverse Griffin's conviction and remand the case with directions to grant his motion to suppress.

---

1. *See also* SIR EDWARD COKE, THIRD INSTITUTE (1644), quoted in JOHN BARTLETT, FAMILIAR QUOTATIONS 172 & n. 2 (15th ed. 1980): "For a man's house is his castle, *et domus sua cuique tutissimum refugium.*" (One's home is the safest refuge to everyone.)

## I

## THE FACTS

There were two witnesses at the suppression hearing. Officer Curt Sloan of the Metropolitan Police Department testified for the prosecution. Bill Griffin's sixteen-year-old brother, Christopher, testified for the defense.

According to Officer Sloan, the police had obtained a search warrant for the apartment in question, which is located in southeast Washington, D.C., after a controlled drug purchase had been made there by a "special employee" one evening, before midnight, some nine to thirteen days earlier. Sloan and the other officers approached the side door of the apartment, where the previous drug buy had allegedly occurred. This door had no windows.[2] Officer Sloan knocked loudly and announced, "Police, I have a search warrant, open up." Ten seconds later, no response having been obtained, Sloan knocked and identified himself once again. After an additional period passed without any response, Officer Sloan stepped aside so that the "ram team [could] get in a position to open the door forcibly with a ram." The "ram team" then broke open the door. Approximately thirty seconds had elapsed between Officer Sloan's initial knock on the door and the ram-enhanced entry into the apartment.

Inside the apartment, the officers found Bill Griffin lying on a sofa in the living room.[3] On a coffee table next to the sofa lay a plastic ziplock bag containing "a white rock substance," which turned out to be crack cocaine. Bill Griffin had $150.00 on his person, and more packages of cocaine and money were recovered elsewhere in the apartment. The officers placed Bill Griffin under arrest and seized the plastic bag and its contents.

Christopher Griffin testified that on the night in question, he was in his bedroom,[4] getting ready to go to bed. He heard loud banging on the door. There were two knocks, and Christopher stated that they came "right behind each other." He did not hear any voices, and did not know that the police were at the door. Suspecting that someone was attempting to break into the house, Christopher grabbed a bat from under one of the two beds in the bedroom and headed towards the dining room. He heard his brother, Bill Griffin, answer the door, and say "who is it?"[5] Immediately thereafter, Christopher heard a loud crash as the door smashed open and swung into the radiator in the kitchen. By the time Christopher reached the dining room, the police were already in the kitchen. They ordered his brother to "freeze" and had him leaning over the stove against the wall.

After hearing extensive argument, the trial judge denied Griffin's motion to suppress. He found both witnesses credible,[6] but accepted Officer Sloan's testimony, apparently finding parts of Christopher's description of the sequence of events less plausible; the judge also thought that Christopher had a greater stake in the outcome than Officer Sloan did. The judge found, in conformity with the officer's testimony, that about thirty seconds elapsed between Officer Sloan's initial announcement and the demise of the door. Correctly noting that, under the applicable case law, a refusal of admittance need not be explicit, the judge concluded that the offi-

---

2. Officer Sloan saw no. lights on in the apartment and heard no television or radio playing, or any other sound. He testified that the windows "appeared to be covered with something that would shield light from coming in." This "something" could also, presumably, have been used at night to keep the light out.

3. The side door of the one-story apartment, located on the ground level of a two-story building, opens into a small hallway with a bedroom, bathroom, utility room, and another bedroom along the right side, and a kitchen, dining room and living room on the left.

4. This bedroom was located on the far side of the utility room, a considerable distance from the door which the police broke down. *See supra,* note 3.

5. On rebuttal, Officer Sloan testified that, "to the best of my recollection," he did not hear anyone ask who is it.

6. "Both sides testified, apparently, truthfully. Nobody was particularly impeached. Nobody looked bad on the witness stand to me. Nobody's demeanor was particularly deficient."

cers had waited a reasonable time before resorting to the battering ram:

> The obvious point is there is no fixed time. We're talking about what's reasonable and that ... at least in my judgment, does allow a sort of a zone for the officers to operate. While I might not make the same decision, they're allowed to make a decision against mine. While I may disagree on how long it takes people to get [dressed] and come down, they're allowed to disagree with me and take a shorter period of time.
>
> They're not at the low extreme of four seconds, but they're in a certain zone of reasonableness.

> \*   \*   \*   \*   \*   \*

> In this case we have the fact that drugs had been sold recently, up around midnight, which is not far away from this time. We have evidence that a police officer knocked not once, but twice, in a loud manner. We have evidence that there [was] a black heavy material over the windows, which would suggest closing people out, and keeping people from seeing light if it was on in there, seeing what was going on inside.
>
> And, we have evidence ... of the wait of thirty seconds. I think that all of this, together with the fact that the police were making an entry for drugs, can be considered, and I think the entry ought to be sustained.

## II

## THE STANDARD OF REVIEW

Before reaching the substantive legal questions presented by this appeal, we must identify the correct standard of review. The basic principles are straightforward and familiar, but we have never heretofore applied them to the issue here presented.

■ The trial judge's findings of "basic, primary, or historical facts—facts in the sense of a recital of external events and the credibility of their narrators," *Townsend v. Sain,* 372 U.S. 293, 309 n. 6, 83 S.Ct. 745, 755 n. 6, 9 L.Ed.2d 770 (1963)— are reviewed deferentially under the "clear-ly erroneous" standard. D.C.Code § 17–305(a) (1989); *Lawrence v. United States,* 566 A.2d 57, 60 (D.C.1989); *United States v. McConney,* 728 F.2d 1195, 1200–01 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). We must also accept the inferences drawn by the trial judge as to the facts before him, so long as those inferences are supportable under any reasonable view of the evidence. *See, e.g., Williams v. United States,* 576 A.2d 700, 703 (D.C.1990).

■ The trial court's legal conclusions, on the other hand, are reviewed under the non-deferential *de novo* standard. *Guadalupe v. United States,* 585 A.2d 1348, 1352 n. 7 (D.C.1991); *United States v. Felder,* 548 A.2d 57, 61 (D.C.1988). "[D]e novo review of questions of law ... serves to minimize judicial error by assigning to the court best positioned to decide the issue the primary responsibility for doing so." *McConney, supra,* 728 F.2d at 1201. In the words of Chief Judge Coffin,

> every important appellate court decision is made by a group of equals. This fact reflects the shrewd judgment of the architects of our state and federal judicial systems that an appellate judge is no wiser than a trial judge. [The appellate court's] only claim to superior judgment lies in numbers; three, five, seven or nine heads are usually better than one.

FRANK COFFIN, THE WAYS OF A JUDGE, 58 (1980) (quoted in *McConney, supra,* 728 F.2d at 1201 n. 8).

■ In the present case, we must decide whether the officers had been "refused admittance" to Griffin's mother's apartment, within the meaning of § 33–565(g), when they broke down the door with a battering ram. This is a "mixed" question of law and fact, *see McConney, supra,* 728 F.2d at 1205, and thus represents the most troublesome kind of inquiry for standard of review purposes. *Id.* at 1200. In determining what deference, if any, should be accorded to a trial court's resolution of such a mixed question, we consider, among other things, whether the issue to be decided more closely resembles one of fact or of law, and

whether the trial court or the appellate court is in a position to render the decision with the higher degree of accuracy. *Felder, supra,* 548 A.2d at 61–63.

The decision whether the officers were refused admittance—whether, judged by an objective standard,[7] the lack of any response thirty seconds after the first knock constituted a constructive refusal on the part of the occupants to admit the police— necessarily goes well beyond an inquiry into the historical facts. The balance we strike between the competing interests will not only have consequences for the parties here, but will also provide legal precedent affecting the rights of future litigants. This is a significant reason for *de novo* review. *McConney, supra,* 728 F.2d at 1201; *see also Jones v. United States,* 548 A.2d 35, 40 (D.C.1988).

■ Moreover, where basic constitutional liberties are implicated, a more searching standard of review may be warranted. *Ker v. California,* 374 U.S. 23, 33–34, 83 S.Ct. 1623, 1629–30, 10 L.Ed.2d 726 (1963), *McConney, supra,* 728 F.2d at 1205 n. 12. We have recognized that the requirements of § 33–565(g) are rooted in constitutional values. *See Williams, supra,* 576 A.2d at 703. The knock and announce rule "serves the important purpose of protecting the individual's right of privacy in his or her own home ..." *Id.*[8]

In *McConney, supra,* the United States Court of Appeals for the Ninth Circuit, sitting en banc, held that the trial judge's determination that exigent circumstances excused officers from complying with the knock and announce requirements of 18 U.S.C. § 3109—the federal analogue of § 33–565(g)—was subject to *de novo* review. The court stated:

The mixed question of exigency is rooted in constitutional principles and policies. Like many such mixed questions, its resolution requires us to consider abstract legal doctrines, to weigh underlying policy considerations, and to balance competing legal interests. In particular, its resolution requires that we strike a balance between two sometimes conflicting societal values—the safety of law enforcement officers and fourth amendment privacy interests. The essential and difficult question raised by this balancing is how much risk police officers can reasonably be expected to assume before disregarding the rules society has adopted to otherwise circumscribe the exercise of their considerable discretionary authority in carrying out their vital law enforcement duties.

This is a question that no amount of factfinding will answer.

728 F.2d at 1205 (footnotes omitted). *Accord, United States v. Robinson,* 174 U.S.App.D.C. 351, 353, 533 F.2d 578, 580 (1976) (en banc) (where historical facts are not in dispute, question whether exigent circumstances exist, so that police may search without a warrant, is "a legal one of constitutional dimension"); *see also Williams, supra,* 576 A.2d at 703; *cf. Brooks v. United States,* 367 A.2d 1297, 1303–04 (D.C.1976).

We are not dealing here with the issue of exigent circumstances,[9] but are called upon to decide instead whether, on this record, thirty seconds of non-response to the officers' knocking in the middle of the night constituted a constructive refusal to admit them. Nevertheless, the considerations which the court in *McConney* found persuasive apply with equal force to the present case.

---

7. *United States v. Bustamante–Gamez,* 488 F.2d 4, 12 (9th Cir.1973) (test for refusal of admittance is whether the circumstances were such as would convince a reasonable person that permission to enter had been refused), *cert. denied,* 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974).

8. The statute also "protect[s] police officers against unnecessary danger and encourag[es] police safety." *Id.* at 703.

9. The government explicitly states in footnote 8 to its brief that "we do not argue in this case that the presence of drugs and the possibility of their destruction created exigent circumstances." A search warrant must be executed within ten days of the date of issuance, *see* Super.Ct.Crim.R. 41(e)(1), and the police executed this warrant on the ninth day.

## III

## THE LEGALITY OF THE FORCED ENTRY

A. *The "Knock and Announce" Statute.*

Section 33–565(g) provides as follows:

The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute the warrant, if, after notice of his authority and purpose, he is refused admittance.

The language of the statute is identical to that of its federal counterpart, 18 U.S.C. § 3109, and we therefore accord respectful consideration to authorities interpreting § 3109.

■ "From earliest days, the common law drastically limited the authority of law officers to break the door of a house to effect an arrest." *Miller, supra,* 357 U.S. at 306–07, 78 S.Ct. at 1194. Like the federal statute, § 33–565(g) thus "codifies a tradition embedded in Anglo–American law and declares the reverence which the law attaches to an individual's right of privacy in his house." *McConney, supra,* 728 F.2d at 1198, quoting *Miller, supra,* 357 U.S. at 313, 78 S.Ct. at 1198. Accordingly, § 33–565(g) should be accorded a generous construction rather than a "grudging" one. *Miller, supra,* 357 U.S. at 313, 78 S.Ct. at 1197–98.[10]

In the present case, the police broke down the door to the apartment with a battering ram. This is no trivial invasion of the privacy of those inside. Aside from the terror that such police action is likely to instill, especially where, as here, it is taken in the middle of the night, the effect of destroying the door may be to deprive the occupants of the apartment of their personal security. For at least some period of time, the potential access of thieves and marauders to the premises is necessarily enhanced.

So drastic a forced entry affects everyone who uses the dwelling, and not just the suspected drug dealer. In the present case, the apartment was leased to Griffin's mother,[11] who has not been charged with anything. It was occupied by at least three other presumptively innocent individuals—Griffin's brother and sister and the sister's infant child; none of Griffin's relatives was arrested. Use of a battering ram to break down the door of a dwelling will almost inevitably harm the innocent as well as those suspected of breaking the law. Whether or not so intended, its practical effect is to inflict *de facto* collective inconvenience which, to innocent persons so inconvenienced, will seem a lot like collective punishment.[12] The liberty interests which § 33–565(g) was designed to protect, and which require a generous construction of the statute, are significant even when an officer simply turns a handle and walks through an unlocked door. *See Sabbath v. United States,* 391 U.S. 585, 589–90, 88 S.Ct. 1755, 1757–59, 20 L.Ed.2d 828 (1968);

---

10. We are duly mindful of the reliance that society must place for achieving law and order upon the enforcing agencies of the criminal law. But insistence on observance by law officers of traditional fair procedural requirements is, from the long point of view, best calculated to contribute to that end. *Miller, supra,* 357 U.S. at 313, 78 S.Ct. at 1197.

11. Indeed, Griffin conceded at the hearing that he did not live there. In the trial court, the government challenged his standing to object to the police entry, primarily on the speculative ground that he might have been present in the apartment without his mother's consent. *See generally Lewis v. United States,* 594 A.2d 542, 545–46 (D.C.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1225, 112 S.Ct. 1225, 117 L.Ed.2d 460 (1992); *cf. Minnesota v. Olson,* 495 U.S. 91, 99–100, 110 S.Ct. 1684, 1689–90, 109 L.Ed.2d 85

(1990). The trial judge did not reach the question of standing, and the government has not addressed it in this court. Since *Griffin* was the tenant's son, since he was present in the apartment in the middle of the night without apparent objection from his mother, and since there is no suggestion that he was a mere party-goer (as in *Lewis, supra* ), we see no reason to explore, *sua sponte,* an issue which the government has not raised with us.

12. Obviously, however, such inconvenience does not constitute punishment in the legal sense. *See, e.g., Bell v. Wolfish,* 441 U.S. 520, 537–38, 99 S.Ct. 1861, 1873–74, 60 L.Ed.2d 447 (1979). Where the government proves that the criteria set forth in § 33–565(g) have been met, the adverse effects of a forced entry on individuals other than the suspect do not render the entry unlawful.

*United States v. Pratter,* 465 F.2d 227, 230 (7th Cir.1972) (Stevens, J.); *cf. United States v. Wood,* 279 U.S.App.D.C. 81, 86–87, 879 F.2d 927, 932–33 (1989). They are at their zenith when the ram team does its work.

■ The particular words of § 33–565(g) which we must construe in this case are the final two: "refused admittance." "Refusal is commonly defined as a rejection, a denial of what is asked." *Board of Public Instr. v. Cohen,* 413 F.2d 1201, 1203 (5th Cir. 1969). It is a volitional act. *Spradling v. Deimeke,* 528 S.W.2d 759, 766 (Mo.1975). "Refusal" to admit the police is to be distinguished from "failure" to do so; the legislature could have used the latter word, but selected the former. In the words of Chief Justice Marshall, to refuse to do something is "an act of the will," while to fail to do it "may be an act of inevitable necessity." *Taylor v. Mason,* 22 U.S. (9 Wheat.) 325, 344, 6 L.Ed. 101 (1824).

Nevertheless, the government is not obliged to prove that the occupants explicitly said "keep out!" We recently stated in *Williams, supra,* that

> the police need not wait for the occupants affirmatively to refuse them admittance if the police can reasonably infer from the actions or inactions of the occupants that they have been constructively refused admittance; under these circumstances, the police may force their entry without delay.

576 A.2d at 703 (citations omitted). A deliberate [13] failure to respond within a rea-

sonable period of time is tantamount to a refusal to admit. *United States v. James,* 528 F.2d 999, 1017 (5th Cir.), *cert. denied,* 429 U.S. 959, 97 S.Ct. 382, 50 L.Ed.2d 326 (1976); *see also United States v. Bonner,* 277 U.S.App.D.C. 271, 273, 874 F.2d 822, 824 (1989). A reasonable period is not defined in the statute, however, and in determining whether a refusal of admittance occurred, courts employ a highly contextual analysis, examining all of the circumstances of the case. *Bonner, supra,* 277 U.S.App.D.C. at 273, 874 F.2d at 824.[14]

■ A forced entry "is not to be made legal by what it turns up; it is good or bad when it starts and does not change character from its success ... or from evidence discovered subsequent to [the entry]." *Brown v. United States,* 590 A.2d 1008, 1013 (D.C.1991) (citations omitted); *see also Miller, supra,* 357 U.S. at 312, 78 S.Ct. at 1197. "It goes without saying that in determining the lawfulness of entry and the existence of probable cause, we may concern ourselves only with what the officers had reason to believe *at the time of their entry." Ker, supra,* 374 U.S. at 40 n. 12, 83 S.Ct. at 1633 n. 12 (emphasis in original); *see also Commonwealth v. Newman,* 429 Pa. 441, 448–50, 240 A.2d 795, 799 (1968) (applying *Ker* rule in "knock and announce" case). The question whether the officers had been refused admittance thus turns on what they could reasonably have believed at the time they used the battering ram,[15] and not on what they discovered

---

**13.** The court in *James* did not use the word "deliberate," but in our view it is implicit in the word "refused" in the statute.

**14.** Some courts have suggested that "[a] reasonable time is ordinarily very brief." *James, supra,* 528 F.2d at 1007, 1017; *Bonner, supra,* 277 U.S.App.D.C. at 273–75, 874 F.2d at 824–26. These declarations were made, however, in circumstances quite different from those here. In *James,* officers had information that a dangerous fugitive was on the premises, the incident occurred in broad daylight, and even so the FBI agents apparently waited considerably longer before forcing entry than the police did in this case. In *Bonner,* a case in which then Chief Judge Wald wrote a spirited and persuasive dissenting opinion, the entry took place in the

early evening hours, and the officers "heard sounds consistent with both refused admittance and destruction of the object of the search." 277 U.S.App.D.C. at 274, 874 F.2d at 825.

**15.** As we have noted in Part I, *supra,* the trial judge intimated that even if he were to view thirty seconds as insufficient, under the circumstances, to enable the occupants to dress and come to the door, the officers "are allowed to disagree with me." We think it is the judge, as an impartial arbiter, and not the police, who must make the determination as to reasonableness. *Cf. Brown, supra,* 590 A.2d at 1013. The judge may, of course, give appropriate consideration to any expertise which the officers demonstrate on the subject, and he must accord due weight in his calculus the safety of the officers.

once they had entered the apartment.[16]

### B. The middle of the night.

As Justice Harlan observed for the Court in *Jones v. United States*, 357 U.S. 493, 498, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514 (1958), "it is difficult to imagine a more severe invasion of privacy than the nighttime intrusion into a private home." The "ram team's" forced entry in this case took place at 1:40 a.m.

The law does not require us to close our minds to facts which are known to all reasonably intelligent people. *Poulnot v. District of Columbia*, 608 A.2d 134, 141–42 (D.C.1992). We may thus take judicial notice that, at that time of night, most people are in bed, and many are asleep. If a person is awakened by banging on the door, an immediate and appropriate response may not be feasible.[17] For at least a brief period, the erstwhile sleeper is likely to be too bewildered to react. He or she must then focus on the possibility that those demanding entry may have no legiti-

mate business on the premises. This is especially true where, as here, the bedroom is a considerable distance from the door, so that a suddenly awakened individual may not hear the officer's oral announcements identifying the apparent disturbers of a peaceful night as police officers armed with a search warrant.[18] Indeed, the occupant's first instinct—a reasonable one— may be to call 911. Moreover, most citizens are not clad at 1:40 a.m. in manner suitable for opening the door to strangers. If someone is not dressed, sufficiently or at all, dressing takes time. Finally, for most people awakened or startled by loud banging at twenty to two in the morning, the circumstances are not likely to be conducive to rational analysis or to swift or provident decision-making.

Moreover, in the present case, the officers observed nothing suggesting that anyone in the apartment was awake. Although Christopher testified that he had the television on, Officer Sloan did not hear it. There were no other lights on.[19] There

---

16. The government argues in footnote 7 to its brief that "many, if not all, of the occupants were awake at the time the officers arrived. Therefore, someone should have been able to respond to the officers' knocks and announcements fairly quickly if he or she desired." This contention is unsound; as noted in the text, the fruits of the forced entry cannot sustain its legality.

17. The trial judge recognized this reality during oral argument on the motion:

> I mean, obviously, sometimes people won't be asleep, but that's ordinarily the time people are asleep. And, you know, he knocks on the door. How much time, what's reasonable for him to allow for somebody to, you know, get up, try to figure out, "What's going on here? Somebody's knocking on my door," to get dressed, or do whatever he needs to do to come answer the door?
> You're in your house, you're asleep, you—I don't know, has it ever happened to you that somebody knocks on the door while you're asleep, and you kind of hear something in the distance. Is it a knock or something, you're thinking about it, and then, you know, they knock again. "Oh, yes, somebody's knocking at my door. Let's see, I better get up, I better go see what's going on." You know, did he allow for this kind of thing?

It is apparent that the judge gave thoughtful and conscious consideration to the time of night at which the forced entry occurred. For rea-

sons stated in Part II, *supra*, however, we must review *de novo* his resolution of the ultimate issue.

18. In the present case, Officer Sloan testified that he yelled "police," but Christopher Griffin asserted that he did not hear him do so. Christopher claimed that Bill Griffin shouted "who is it," but Officer Sloan stated that he did not hear that. The judge having found both witnesses basically credible, it appears that, under the conditions existing, it was not easy, either for those inside the apartment or for those outside it, to hear words spoken at some distance. The judge made no explicit finding to that effect, but also no indication to the contrary. *See Brown, supra*, 590 A.2d at 1021 n. 19 (trier of fact should ordinarily attempt to reconcile the sworn accounts of apparently credible witnesses, accept undisputed credible testimony, and make credibility choices only where reconciliation cannot be effected).

19. The government also contends in its brief that because the windows were covered with "heavy material," the officers could reasonably infer that the occupants "wished to keep light from escaping and that they may indeed be awake and engaged in illegal activity." Officer Sloan testified, however, that the windows "appeared to be covered with something that *would shield light from coming in.*" (Emphasis added). The use of curtains or "heavy material" to keep light out of an apartment at night can

were no footsteps. Beyond the events that had led to the issuance of the search warrant a week and a half to two weeks earlier,[20] there was no suspicious activity at all.

### C. How much time is reasonable?

Since, in determining whether the officers were constructively refused admittance, we engage in a "highly contextual" analysis, see discussion at page 120, *supra,* a comparison of the delay of approximately thirty seconds in this case with shorter and longer periods in other cases can take us only so far. Although prior decisions may of course provide some useful guideposts, precise "case matching" may be no more feasible in "knock and announce" cases than it is in Fourth Amendment litigation. *See Gomez v. United States,* 597 A.2d 884, 889 (D.C.1991). Nevertheless, we note that no authority has been cited to us in which a delay of only thirty seconds has been held sufficient in the absence of some suspicious activity following the arrival of the police, or some other circumstance which the court viewed as equivalent thereto. In those cases in which forced entry was upheld without such a circumstance, the police waited considerably longer than here.

For example, in *United States v. Leichtnam,* 948 F.2d 370 (7th Cir.1991), in which the police use of a battering ram to break down a door at 6 a.m. was upheld by the court, the ramming occurred approximately a minute and a half after the officers first announced themselves and began the far less destructive activity of attempting to pry open a screen door. *Id.* at 374. In *United States v. Woodring,* 444 F.2d 749 (9th Cir.1971), in which the execution of a search warrant in the daytime or early evening[21] was upheld by the court, the officers, who had reason to believe that someone was in the house, announced their authority and purpose and waited approximately one minute before breaking in. *Id.* at 751. *See also United States v. Viale,* 312 F.2d 595, 602 (2d Cir.), *cert. denied,* 373 U.S. 903, 83 S.Ct. 1291, 10 L.Ed.2d 199 (1963) (delay of one to two minutes). None of these cases is comparable to the present one, in which the police waited no more than thirty seconds in the middle of the night. *See also Annotation:* 21 A.L.R. FED. 820, 834–42 (1974 & Supp.1992).

More in point is the decision of the Supreme Court of Pennsylvania in *Newman, supra.* In that case, police detectives executed a search warrant in the middle of the day. They banged on the door and announced loudly that they were the police. When there was no response within about twenty seconds, they broke in the door with a sledge hammer. In holding on several grounds that the forced entry was unlawful, the court stated:

> Surely a mere twenty second delay in answering the door cannot constitute support for a belief that evidence was being destroyed (or in terms of 18 U.S.C. § 3109, a refusal of admittance). In *Ametrane,*[22] *supra,* the delay was a full minute, yet the district court did not find any exigent circumstances justifying a forceful entry made without proper notice. The court pointed out that Ametrane was on the second floor and "might have had countless legitimate reasons for taking a minute to answer the door." 276 F.Supp. at 559. Although it is doubtful that a different result would obtain

hardly be characterized as unusual. The government's position seems to be that, to avoid suspicion, the occupants of a residence which, unbeknownst to them, is the subject of a search warrant, must "open up their shades and let the sun [or moon] shine in!"

**20.** The government argues, and the trial judge apparently believed, that the controlled drug purchase was made in the late evening "shortly before midnight," and that this made it probable that the occupants would be awake at 1:40 a.m. on the day the warrant was executed. In fact, Officer Strand did not know at what time the

purchase was made; all that he said was "in the evening before midnight." The word "shortly" was added to the description by the brief-writer. That someone was up one evening at some unknown length of time before midnight sheds little or no light on whether anybody was awake in a dark apartment at 1:40 a.m. nine to thirteen days later.

**21.** Specifically, "an hour and half after sunset." 444 F.2d at 751.

**22.** *United States ex rel. Ametrane v. Gable,* 276 F.Supp. 555 (E.D.Pa.1967).

even if Newman had been on the first floor, Newman, too, was on the second floor.... The fact that some lottery paraphernalia [are] easily destroyed does not justify the suspension of the Fourth Amendment in all lottery prosecutions. 429 Pa. at 448, 240 A.2d at 798. Given the night-time context of the present case, the reasoning of *Newman* applies *a fortiori.*

The authorities relied on by the government in which police officers waited for less than thirty seconds are distinguishable upon the common ground that, in each, there were additional suspicious circumstances justifying a reasonable belief on the part of the officers that immediate action was required. In *Masiello v. United States,* 115 U.S.App.D.C. 57, 58, 317 F.2d 121, 122 (1963), for example, "the officers hear[d] sounds which indicat[ed] to them that the evidence sought by the warrant [might] be in [the] process of destruction;" the court, speaking through Judge (later Chief Justice) Burger, approved the entry on narrow grounds after an earlier remand, emphasizing that close cases will receive careful scrutiny. *Id.* at 59, 317 F.2d at 123. In *United States v. Davis,* 199 U.S.App. D.C. 95, 98, 617 F.2d 677, 695 (1979), officers who were executing a search warrant at 2:20 a.m. observed lights on in the house which indicated that someone inside was awake; when there was no response in a period of fifteen to thirty seconds, they gained entry with a battering ram. In *Wood, supra,* 279 U.S.App.D.C. at 85–87, 879 F.2d at 931–33, a DEA agent executed a search warrant at 2:55 p.m. and waited for fifteen to thirty seconds after knocking and announcing before entering; entry was accomplished by turning the door knob, and without breaking down the door. In *United States v. Ciammitti,* 720 F.2d 927, 932– 33 (6th Cir.1983), *cert. denied,* 466 U.S.

970, 104 S.Ct. 2342, 80 L.Ed.2d 816 (1984), in which a search warrant was executed shortly after midnight, the officers observed the light on in a basement room, and knew that odors associated with the production of drugs had been detected coming from the basement on previous nights when the light was on; a majority of the court held, over a powerful dissent by Judge Jones, that the officers were justified in breaking down the door after half a minute.[23] In *United States v. DeLutis,* 722 F.2d 902 (1st Cir.1983), the officers, knowing that the defendants had entered their house a short time earlier with a police informant, that the house was occupied, and that the residents were awake,[24] *id.* at 904, forced entry more than twenty seconds after knocking on the door and announcing that they were executing a search warrant. *Id.* at 908–09. *See also United States v. Ruminer,* 786 F.2d 381, 383 (10th Cir.1986) (brief wait sufficient where officers saw someone run out of the bedroom).[25] See also note 14, *supra,* distinguishing this case from *James* and *Bonner.*

D.  *The existence of a warrant, the danger of destruction of evidence, and the connection between drugs and weapons.*

This court has recognized that "[t]he issuance of a warrant ... signifies that a judicial officer has made a determination that there are reasonable grounds to believe that the information underlying the warrant is true and of sufficient reliability and timeliness to justify a search for up to ten days." *Williams, supra,* 576 A.2d at 704. The warrant requirement guards against searches based on no more than "officers' conclusions formed prior to the

---

**23.** The court referred to "half a minute" in its opinion, 720 F.2d at 933. The trial judge had found that the officers "started to break the door down with a battering ram" after having pounded the door for approximately fifteen and thirty seconds without receiving a response. *Id.* at 932.

**24.** The opinion in *DeLutis* does not reveal the time of day when the warrant was executed. The incident occurred, however, shortly after

one of the defendants arrived at home from the airport. The court's recitation of the facts is inconsistent with any notion that the occupants of the house could have been asleep; the police arrived immediately after the informant left.

**25.** The reasoning of *Ruminer* is questionable, however, for the individual in the bedroom could have been running to open the door.

search." *Bonner, supra,* 277 U.S.App. D.C. at 274, 874 F.2d at 825. The government argues, based upon these authorities, that in the present case it was likely that drugs were in the apartment, and that the occupants would dispose of them unless the police moved with dispatch.

There is no doubt that, in general, possession of a warrant enhances the officers' authority to conduct a search. Section 33–565(g), however, presupposes the existence of a search warrant, but nevertheless requires a showing of refusal of admittance. Accordingly, the government's argument simply proves too much. Whenever there are unlawful drugs (or other contraband) on the premises and the officers delay their entry until after they have been refused admittance, there is a danger that the delay will enable persons on the premises to destroy potential evidence. As the Supreme Court of Arizona explained in *State v. Bates,* 120 Ariz. 561, 563, 587 P.2d 747, 749 (1978) (en banc), however,

> [t]he mere fact that this search warrant was executed for the purpose of discovering narcotics does not necessarily create an exigent circumstance justifying immediate entry. In *State v. Mendoza,* 104 Ariz. 395, 399–400, 454 P.2d 140, 144–45 (1969), this court emphasized that, standing by itself, the easy destructibility of narcotics evidence is insufficient to provide reasonable cause for officers to believe that announcement of the purpose of their entry would frustrate the search, and therefore, relieve them of the necessity of announcing their identity and purpose. There must be "substantial evidence" to cause the police to believe evidence would be destroyed, irrespective of the evidence sought, otherwise A.R.S. § 13–1446(B) [26] would become a nullity in narcotics cases. *Id.*

*Accord, Newman, supra,* 429 Pa. at 446–50, 240 A.2d at 798–99; *United States v. Rodriguez,* 663 F.Supp. 585, 588–89 (D.D.C.

1987); *United States v. Doering,* 384 F.Supp. 1307, 1311 (W.D.Mich.1974).

Relying on *Williams, supra,* 576 A.2d at 701, the government claims that it is common knowledge that those trafficking in controlled substances often use firearms, and that in the interest of their own safety, the police were justified in effecting their forced entry without further delay. In *Williams,* however, the police had been informed that, along with unlawful drugs, "there were several weapons in the house and that a man armed with an automatic gun was seated in the living room next to the front window." *Id.* Additionally, a departing visitor who had spotted the police ran back into the house, yelling "police officers." *Id.* at 702. There were no such circumstances in the present case. Although, as we recently reiterated, "drugs and weapons go together" and their sinister association is a close one, *Marshall v. United States,* No. 89–CF–800, slip op. at 8, 1992 WL 143753 (D.C. Jun. 26, 1992) (citations and internal quotation marks omitted), the existence of that unfortunate connection, without more, cannot lend any substantial support to the government's position. Were we to hold otherwise, then § 33–565(g) would be undermined to the point of inefficacy in any search warrant case involving alleged distribution of narcotics. *See also Gomez, supra,* 597 A.2d at 890–91; *Terry v. Ohio,* 392 U.S. 1, 32, 88 S.Ct. 1868, 1885, 20 L.Ed.2d 889 (1968) (Harlan, J., concurring).

## IV

## CONCLUSION

We summarize. Special circumstances supporting a reasonable belief on the part of the police that the occupants' non-response to knocking and announcement pursuant to § 33–565(g) is deliberate [27] will justify a forced entry almost

---

**26.** This statute is the Arizona analogue to § 33–565(g).

**27.** The fact situations in which officers may draw such conclusions are varied, but include, for example, their hearing of footsteps running in the wrong direction, or their observance of persons retreating from the door, or their discovery that an occupant is standing still and making no response whatsoever, or the drawing back of a shade followed by sounds of a rapid retreat from the door.

immediately after their detection. In the absence of such circumstances, however, we agree with Judge (now Justice) Stevens that "[a] significant time lapse" is required to justify a conclusion that admittance was refused. *Pratter, supra,* 465 F.2d at 233 n. 13; *see also Bustamante–Gamez, supra,* 488 F.2d at 12 ("an explicit refusal of admittance or lapse of a significant amount of time is necessary if the officers have no facts indicating exigency"). This is because, in light of the fundamental liberty interests implicated—and these interests are at their peak when a door to a residence is broken down, especially at night— § 33–565(g) must be generously construed, and the government must be put to its proof.

In the present case, we hold that no refusal of admittance was shown. As Judge Jones has so eloquently written (in a case which was substantially stronger for the government than the present one is, see discussion at pages 122–123, *supra* ),

> [t]he [officers], in fact, allowed [the occupant] less than one half of one minute at that hour of the night to answer her front door. I am unable to believe that it was reasonable to expect that this or any individual could have, or *would have,* unlocked the front door at 12:15 in the morning to a group of yelling and pounding strangers—and do so within one half of one minute. Certainly no reasonable law enforcement should have sensibly expected that a 15 to 30 second delay in answering the door at that hour constituted a denial of admittance.

*Ciammitti, supra,* 720 F.2d at 934 (dissenting opinion) (emphasis in original).

Griffin was found guilty by a jury, and the reversal even of a misdemeanor conviction for reasons unrelated to guilt or innocence does not come cost free. *Cf. Allen v. United States,* 603 A.2d 1219, 1228 & n. 19 (D.C.1992). As Justice Stevens so cogently

explained for his former court before his ascension to the Supreme Court bench,

> [t]he price which society must pay to forestall the repetition of such blunders is that the accused shall go free, or at least at his trial the evidence seized as a result of that invasion of his home may not be used against him. Otherwise the congressional requirement of professionalism in the execution of search warrants might not accomplish its dual purpose of protecting the privacy of the home and ensuring a high degree of expertise in the performance of a vital police function.

*Pratter, supra,* 465 F.2d at 233 (citations omitted).

In *Pratter,* the agents simply turned the door knob at 2:45 p.m. and walked into the defendant's house, weapons drawn. In the present case, they broke down the door. The time was 1:40 in the morning.

Griffin's conviction is reversed, and the case is remanded with directions to grant his motion to suppress tangible evidence.

So ordered.

TERRY, Associate Judge, dissenting:

The question presented by this appeal is whether the arresting officers were "refused admittance" within the meaning of D.C.Code § 33–565(g) (1988) [1] and hence were justified in forcibly entering the apartment to execute their search warrant. Guided by long-established precedent, and giving the requisite deference to the trial court's findings of fact, I would uphold the trial court's denial of appellant's motion to suppress evidence and affirm the judgment of conviction. Since my colleagues take a different view, I respectfully dissent.

I

At approximately 1:35 a.m., Officer Curt Sloan and several other members of the Metropolitan Police went to an apartment

---

*Annotation, supra,* 21 A.L.R.Fed. at 835 (citations omitted). As noted previously, the lack of response at night, although the light is on inside, may also support such a conclusion.

**1.** D.C.Code § 33–565(g) provides:

> The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute the warrant, if, after notice of his authority and purpose, he is refused admittance.

on Mellon Street, S.E., to execute a search warrant for narcotics and drug paraphernalia. The warrant was based on a previous late-night purchase of narcotics at the same address by an informant. As the informant had done, the search team went to the side door of the apartment. That door had no windows, and, according to the testimony, the windows at the front of the apartment were "covered with a heavy-type material" so that no light emanated from inside. The officers could not hear any sounds coming from the apartment.

At the side door, Officer Sloan knocked loudly and announced, "Police, I have a search warrant, open up." About ten seconds passed without a response, and Officer Sloan repeated the knocking and announcement. After waiting an additional ten seconds without receiving a response, the officers used a battering ram to force their way in. The total elapsed time between Officer Sloan's initial knock and the search team's forced entry was approximately thirty seconds.

Once inside the apartment, the officers found appellant Griffin lying on a sofa in the living room. On a nearby coffee table lay a plastic bag containing "a white rock substance" which turned out to be crack cocaine. The search team placed Griffin under arrest and seized the plastic bag and its contents.

## II

The District of Columbia "knock and announce" statute, D.C.Code § 33–565(g) (1988), is identical to its federal counterpart, 18 U.S.C. § 3109 (1988). *Williams v. United States*, 576 A.2d 700, 703 (D.C. 1990). The federal courts have construed the statutory language to allow for a "constructive refusal" of admittance. "[T]he phrase 'refused admittance' is not restricted to an affirmative refusal." *Masiello v. United States*, 115 U.S.App.D.C. 57, 58, 317 F.2d 121, 122 (1963). Thus the police may forcibly enter a dwelling if they can reasonably infer from the action or inaction of the occupants that they have, "in effect, been refused admittance." *United States v. Bonner*, 277 U.S.App.D.C. 271, 273, 874

F.2d 822, 824 (1989). In considering a claim of constructive refusal, the courts engage in "a highly contextual analysis, examining all the circumstances of the case," to determine whether the police inference was reasonable. *Id.*

A common example of constructive refusal is the occupant's failure to respond to a police officer's request for admittance. If the officer announces his or her purpose and authority pursuant to a search warrant, and the occupant does not respond within a reasonable period of time, the officer may forcibly enter. *United States v. Wood*, 279 U.S.App.D.C. 81, 86, 879 F.2d 927, 932 (1989). The length of time that the police must wait before they may construe a lack of response as a denial of admittance "depends largely on factual determinations made by the trial court." *United States v. Davis*, 199 U.S.App.D.C. 95, 113, 617 F.2d 677, 695 (1979) (citation omitted), *cert. denied*, 445 U.S. 967, 100 S.Ct. 1659, 64 L.Ed.2d 244 (1980). Although there is nothing in either the federal or the local statute prescribing how long the police must wait after knocking and announcing, *see Masiello, supra,* 115 U.S.App.D.C. at 58, 317 F.2d at 122, a reasonable time "is ordinarily very brief." *United States v. James*, 528 F.2d 999, 1017 (5th Cir.1976) (citation omitted); *see, e.g., United States v. Bonner, supra,* 277 U.S.App.D.C. at 275, 874 F.2d at 826 (eleven to twelve seconds); *United States v. Ciamitti*, 720 F.2d 927 (6th Cir.1983) (thirty seconds), *cert. denied*, 466 U.S. 970, 104 S.Ct. 2342, 80 L.Ed.2d 816 (1984); *United States v. Wysong*, 528 F.2d 345 (9th Cir. 1976) (five to ten seconds); *United States v. Woodring*, 444 F.2d 749 (9th Cir.1971) (one minute); *Masiello, supra,* 115 U.S.App.D.C. at 58, 317 F.2d 121 (ten to thirty seconds after the first knock, plus ten to twenty seconds after the second knock).

In considering Griffin's arguments, this court must afford to the government, as appellee, all legitimate inferences from the testimony and uncontroverted facts of the record, and must affirm the trial court's denial of the motion to suppress if it is

supportable under any reasonable view of the evidence. *E.g., United States v. Rorie,* 518 A.2d 409, 410 (D.C.1986); *United States v. Covington,* 385 A.2d 164, 166 (D.C.1978); *Brooks v. United States,* 367 A.2d 1297, 1304 (D.C.1976). Thus the trial court's factual findings must be upheld unless they are clearly erroneous. *E.g., Lawrence v. United States,* 566 A.2d 57, 60 (D.C.1989); *see* D.C.Code § 17–305(a) (1989).

In this case the court relied on four facts in determining that the officer's forced entry was permissible: (1) Officer Sloan knocked "not once but twice in a loud manner," (2) the officers waited approximately thirty seconds before forcing entry, (3) there was information in the affidavit supporting the search warrant that drugs had recently been sold in the apartment "around midnight," and (4) a heavy material covered the front windows, "which would suggest closing people out and keeping people from seeing light if it was on in there, seeing what was going on inside." The court held that these facts, viewed in combination, placed the officers within "a certain zone of reasonableness" in concluding that they had been constructively refused admittance.

Griffin contends that the thirty seconds between the initial knock and the forced entry was an unreasonably short time to allow for a response because it was 1:35 a.m., a time when the occupants of the apartment would most probably be asleep. I agree that the very late hour makes this a close case, but I think my colleagues in the majority give it too much weight. The trial court found, in light of *all* the relevant factors—including, but not limited to, the time of night—that the forced entry was reasonable, and we cannot ignore or overturn that finding because there is evidence to support it. The hour at which police officers execute a search warrant is surely a factor to be considered in deciding the reasonableness of a forced entry, but it is just as surely not the only factor. Nor, on the facts of this case, is it dispositive. As the government points out in its brief, "the time of night when the search took place was reasonably tied to information related to the search warrant. Specifically, 1:35 a.m. was a time of night that the officers could reasonably expect that drug transactions might occur at [the apartment]." Moreover, the fact that a heavy material covered the front windows and prevented light from escaping could reasonably sustain an inference that the occupants were not only awake but engaged in illicit activity, such as preparing drugs for sale. Thus the inference that the occupants were likely to be awake is supportable under a reasonable view of the evidence.

Another factor to be considered as favoring a forcible entry is the possible "imminent destruction of evidence." *Williams v. United States, supra,* 576 A.2d at 703 (citation omitted); *accord, e.g., United States v. Wysong, supra,* 528 F.2d at 348. Here the officers were acting under the authority of a search warrant for drugs, and were therefore justified in believing that drugs were present in the apartment. *United States v. Wood, supra,* 279 U.S.App.D.C. at 87, 879 F.2d at 933. Under the circumstances the trial court could find it reasonable for the officers to expect that the occupants might try to dispose of the drugs upon being told that the police were about to enter and conduct a search. The thirty-second interval between the initial knock and the forced entry gave the occupants enough time to respond to the officers' request for admittance, without also giving them an opportunity to dispose of the drugs.

Finally, the fact that Officer Sloan knocked and gave notice of his purpose and authority twice, rather than once, before the search team forcibly entered the apartment is another factor to be considered. Because the officer was knocking on the door of an apartment rather than, say, a three-story house, one could reasonably infer that the knocks and announcements were audible anywhere inside the premises. Likewise, it is reasonable to infer that thirty seconds were an ample amount of time to elicit a response within a dwelling of this size. In these circumstances, the lack of a response from the occupants after two in-

stances of loud knocking and two requests for admittance could reasonably lead the officers to believe the occupants were deliberately ignoring their requests.

All of these factors, viewed as a whole, support the trial court's ruling that the officers were within "a certain zone of reasonableness" in believing they had been constructively refused admittance and that they were therefore justified in breaking down the apartment door with a battering ram. I would hold, therefore, that there was no violation of the "knock and announce" statute, D.C.Code § 33–565(g). Because the majority concludes otherwise, I must dissent.